**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HEALTHCOR OFFSHORE MASTER FUND, L.P. and HEALTHCOR SANATATE OFFSHORE MASTER FUNDS, L.P., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | JURY TRIAL DEMANDED |
| STERICYCLE, INC., CHARLES A. ALUTTO, DANIEL V. GINNETTI, and JOSEPH BRENT ARNOLD, | ) ) ) ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ................................................................................................. 2

JURISDICTION AND VENUE .......................................................................................... 5

PARTIES ............................................................................................................................... 6

    I.    Plaintiffs ................................................................................................................. 6

    II.   Defendants ............................................................................................................. 6

FACTUAL ALLEGATIONS ............................................................................................... 7

    I.    Stericycle's Business and Customers....................................................................... 7

    II.   Stericycle's Reporting Obligations as a Public Company ................................. 9

    III.  Defendants Mislead the Market about the Basis for, and the Sustainability of, Stericycle's Growth, Stericycle's Compliance with its Customer Contracts, and Stericycle's Ability to Retain Customers ................................................................. 13

    IV.  Unbeknownst to Investors, Stericycle's Growth Was Driven by an Improper and Unsustainable Practice of Imposing Automatic Price Increases and on Charging Arbitrary Fees to its SQ Customers ................................................. 16

    V.   Defendants' Lies Begin to Unravel....................................................................... 23

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .............. 25

    I.    Misrepresentations and Omissions about the Source of Stericycle's Growth ............... 25

    II.   Misrepresentations and Omissions about Stericycle's Contracts ................................. 32

    III.  Misrepresentations and Omissions about Stericycle's Customers................................. 34

    IV.  Misrepresentations that Stericycle Operated in Accordance with the Terms of its Customer Contracts ............................................................................................ 39

    V.   Misrepresentations about the Effectiveness of Stericycle's Disclosure Controls and Procedures ..................................................................................... 40

ADDITIONAL ALLEGATIONS OF SCIENTER....................................................... 43

PLAINTIFFS' ACTUAL RELIANCE .......................................................................... 46

PRESUMPTION OF RELIANCE ................................................................................... 48

LOSS CAUSATION.................................................................................................................. 49

NO SAFE HARBOR ................................................................................................................. 51

FIRST CAUSE OF ACTION .................................................................................................... 51

SECOND CAUSE OF ACTION ............................................................................................... 54

THIRD CAUSE OF ACTION ................................................................................................... 56

PRAYER FOR RELIEF ............................................................................................................ 57

JURY DEMAND ....................................................................................................................... 58

Plaintiffs HealthCor Offshore Master Fund, L.P. and HealthCor Sanatate Offshore Master Funds, L.P. (collectively, "Plaintiffs") are investment funds that purchased the publicly listed and traded common stock of Defendant Stericycle, Inc. ("Stericycle" or the "Company") and were damaged in connection therewith. Plaintiffs, through their undersigned attorneys, by way of this Complaint, bring this action against Stericycle and certain of its former and present officers, Defendants Charles A. Alutto ("Alutto"), Daniel V. Ginnetti ("Ginnetti"), and Joseph Brent Arnold ("Arnold" and, collectively with Stericycle, Alutto, and Ginnetti, "Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to other matters.

Plaintiffs' information and belief is based on, among other things, an investigation by their attorneys, which includes, among other things, a review and analysis of: Stericycle's public filings with the United States Securities and Exchange Commission ("SEC"); Stericycle conference and earnings call transcripts; investor presentations drafted by Stericycle; press releases and public statements issued by Stericycle and its representatives; deposition transcripts and declarations filed in the matter *In re: Stericycle, Inc., Sterisafe Contract Litigation*, No. 1:13-cv-05795 (N.D. Ill.) (the "Consumer Class Action"); documents publicly filed in the matter *In re Stericycle, Inc. Securities Litigation*, No. 1:16-cv-07145 (N.D. Ill.) (the "Securities Class Action"); media and analyst reports concerning Stericycle; and other publicly available documents and data concerning Stericycle.

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is an action to recover significant investment losses suffered as a result of Defendants' fraudulent conduct.  Defendants misled the market about the basis for Stericycle's growth and concealed from investors their covert practice of imposing usurious price increases on Stericycle's small business customers.

2.     Stericycle is a publicly traded healthcare waste disposal company.  As has now been revealed by transcripts of depositions of Stericycle employees that were made public only recently, during the relevant period Stericycle applied a semiannual 18% price increase on the monthly subscription fee that it was charging small businesses to collect their healthcare waste.  Stericycle also imposed arbitrary environmental and regulatory fees on these customers.  Neither the 18% subscription fee increase nor the environmental and regulatory fees were warranted by a rise in Stericycle's own costs.  Rather, Stericycle rammed these fees down the throats of its small business customers in order to meet the Company's revenue goals.  However, doing so violated the terms of their customers' contracts with Stericycle.

3.     The decision to impose the significant fee increases and arbitrary charges was made by Stericycle's executive team, including Defendants Alutto, Ginnetti, and Arnold.  They ordered the fee increases so that the Company would meet Wall Street analysts' expectations, which in turn caused Stericycle's stock price to continue to rise.  As a result of generating inflated revenue through improper fee increases, these executives profited handsomely.

4.     Defendants' practice was not only illegal, but also unsustainable.  Once customers became wise to the fee increases, they attempted to cancel their contracts.  Although Stericycle went to great lengths to try and retain these customers – including lying to them about the basis for the fee increases – Defendants were ultimately unable to avoid the inevitable hit to the

Company's bottom line caused by continuously raising the cost of services while having no valid justification for doing so.

5.     Defendants hid their illicit practice from the investing public for many years. Instead of revealing to investors that they were meeting Stericycle's revenue goals because of improper fee increases, Defendants falsely attributed Stericycle's impressive financial performance to its small business customers' appreciation of the quality of Stericycle's services. Specifically, Defendants told investors that because "small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide. ***We consider this factor to be the basis for the higher gross margins that we have achieved with our small-quantity customers relative to our large-quantity customers.***"[1]  The source of Stericycle's growth was incredibly important to Plaintiffs because a company whose revenues, gross profits, and earnings per share are growing organically and sustainably because of customer appreciation of the services provided – as Defendants represented – is much different than a company whose revenues are temporarily boosted by unsustainable price increases imposed in violation of customer contracts.

6.     In addition to misrepresenting the source of Stericycle's growth, Defendants also concealed that Stericycle was violating the terms of its customer contracts by imposing the semiannual 18% price increases and arbitrary fees.  Instead, Defendants told investors that Stericycle was operating in accordance with its customer contracts.  This was blatantly false because the contracts permitted fee increases only if Stericycle itself incurred increased operating expenses.  The semiannual fee increases and imposition of arbitrary environmental and regulatory fees bore no relation to Stericycle's actual costs, and thus were not permitted under the contracts.

---

[1] Unless otherwise indicated, bold and italic emphasis used in quotations throughout this Complaint has been added and did not appear in the original quotation.

7.     Defendants also misrepresented the nature of the Company's relationships with its customers. Rather than telling investors the truth – that Stericycle was fleecing and lying to its small business customers – Defendants reported that Stericycle's customers were loyal, provided a stable and profitable customer base, and that the Company had a high customer retention rate. That was not the case. In fact, the opposite was true. Stericycle went to great lengths to try and retain customers who wanted to cancel their contracts because of the improper fee increases, but their efforts to do so ultimately failed.

8.     Finally, Defendants misrepresented the effectiveness of Stericycle's disclosure controls and procedures. Although the impermissible price increases and arbitrary fees were well-known to, and imposed at the direction of, Stericycle's executive team, the Company did not have sufficient disclosure controls and procedures in place to ensure that such material information was reported to investors. At best, Defendants were indifferent to ensuring that Stericycle had adequate disclosure controls and procedures in place. At worst, Defendants were actively disregarding Stericycle's (clearly insufficient) disclosure controls and procedures so that they could continue to use the price increases and fees as a means to boost Stericycle's revenue and meet Wall Street expectations.

9.     The effect of Defendants' material misrepresentations and omissions was to artificially inflate the price of Stericycle's common stock.

10.     When the truth was partially revealed to the market and the previously concealed risks partially materialized in October 2015, the price of Stericycle common stock plummeted by more than 19%, from a closing price of $149.04 per share to a closing price of $120.31 per share.

11.     Plaintiffs are investment funds that purchased Stericycle common stock between July 24, 2015, and October 1, 2015, during the time when Defendants, unbeknownst to Plaintiffs,

were misrepresenting the source of Stericycle's growth, concealing that Stericycle was violating the terms of its customer contracts, misrepresenting the state of Stericycle's customer relationships, misstating that Stericycle had operated in accordance with its customer contracts, and misrepresenting the effectiveness of Stericycle's disclosure controls and procedures.

12.     Plaintiffs therefore bring this action under the federal securities laws and the common law to recover the investment losses they suffered as a result of Defendants' materially false and misleading misstatements and omissions of material fact.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

I. **Plaintiffs**

17.     Plaintiff HealthCor Offshore Master Fund, L.P. is a Cayman Islands exempted company whose investment adviser has its main office in New York, New York.  A list of the dates on which it purchased Stericycle common stock during the relevant period is attached hereto as Exhibit A.

18.     Plaintiff HealthCor Sanatate Offshore Master Funds, L.P. is a Cayman Islands exempted company whose investment adviser has its main office in New York, New York.  A list of the dates on which it purchased Stericycle common stock during the relevant period is attached hereto as Exhibit B.

19.     At all relevant times, HealthCor Management, L.P. ("HealthCor") acted as investment adviser to Plaintiffs in connection with their purchases of Stericycle common stock.

II. **Defendants**

20.     Defendant Stericycle is a Delaware corporation with its principal place of business located at 2355 Waukegan Road, Bannockburn, Illinois 60015.  Stericycle's common stock is publicly traded in the United States on the NASDAQ Global Select Market under the ticker symbol "SRCL."

21.     Defendant Alutto was Stericycle's President, Chief Executive Officer ("CEO"), and a member of the Board of Directors during the relevant period.  Cindy Miller replaced Alutto as President and CEO on September 28, 2018, and Alutto retired from Stericycle on May 2, 2019.

22.     Defendant Ginnetti was Stericycle's Chief Financial Officer ("CFO") during the relevant period.  Ginnetti was replaced as CFO on June 1, 2019, and is currently Stericycle's Executive Vice President, International.

23.     Defendant Arnold was Stericycle's Executive Vice President and Chief Operating Officer ("COO") during the relevant period.  Miller replaced Arnold as COO on September 28, 2018.

## FACTUAL ALLEGATIONS

### I.     Stericycle's Business and Customers

24.     Stericycle is a medical waste disposal business founded in 1989.  What started as a single facility in Lake Forest, Illinois, has grown to include more than 650 facilities and 25,500 employees worldwide.

25.     Medical waste is waste generated at healthcare facilities – such as hypodermic needles used in hospitals – that is potentially contaminated by blood or other bodily fluids. Medical waste is not subject to ordinary garbage disposal and recycling procedures because doing so would expose members of the public to infectious diseases.

26.     Because of its danger to the public health, the disposal of medical waste is highly regulated by the federal and state governments.  Companies that generate medical waste generally must retain a qualified medical waste disposal company that can safely collect and dispose of the medical waste in a way that does not endanger the public health.

27.     Stericycle is one such company.  Stericycle collects, transports, and disposes of all types of regulated waste, including medical waste, hazardous waste, and pharmaceutical waste. Typically, Stericycle collects regulated waste from its customers and transports it to a processing facility.  The waste is steamed, heated, or burned to kill pathogens and render it non-infectious. The waste is then transported to a landfill for disposal.

28.     Stericycle touts itself as a global leader across its "various service lines, including regulated medical waste, retail and healthcare hazardous waste, secure information destruction, and product recalls and returns."

29.     Stericycle has over a million customers across 22 countries and all 50 states.  The majority of these customers are healthcare businesses, but Stericycle also provides services to retailers, manufacturers, financial services providers, professional services providers, governmental entities, and other businesses.

30.     Stericycle's customer base is divided into two groups:  (1) large quantity ("LQ") businesses, like hospitals; and (2) small quantity ("SQ") businesses, like doctor's offices, dental practices, veterinary clinics, and retail pharmacies.

31.     Notwithstanding their smaller size, SQ customers are an extremely important part of Stericycle's business because they generate higher profit margins for Stericycle than its LQ customers and account for almost two-thirds of Stericycle's revenue.

32.     Indeed, in an 2016 investor presentation, Stericycle highlighted the importance of SQ customers to its business:



33.     Stericycle informed investors that it specifically targeted SQ customers as a growth area.  According to the Company, it could achieve higher gross margins with SQ customers because "when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide." It was this reason, according to Defendants, that was "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LQ] customers."

## II.     Stericycle's Reporting Obligations as a Public Company

34.     Under the federal securities laws and the regulations and guidance promulgated by the SEC pursuant to those laws, companies whose stock is publicly traded in the United States – such as Stericycle – have important public reporting and disclosure obligations.

35.     Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and financial condition. Investors generally rely on the accuracy and transparency of these disclosures – as well as other public statements made by the company – when determining whether to invest.

36.     The following table sets forth the relevant filings that Stericycle made with the SEC during the relevant period, the date they were filed with the SEC, which of the Defendants signed those filings, and how they are referred to throughout this Complaint:

| Description of the Filing | Date of the Filing | Defendant Signatories | Abbreviation |
|---|---|---|---|
| Form 8-K for the year ended December 31, 2014 | February 5, 2015 | Ginnetti | "2014 8-K" |
| Form 10-K for the year ended December 31, 2014 | March 3, 2015 | Alutto and Ginnetti | "2014 10-K" |
| Form 8-K for the quarter ended March 31, 2015 | April 23, 2015 | Ginnetti | "1Q2015 8-K" |

| Description of the Filing | Date of the Filing | Defendant Signatories | Abbreviation |
|---|---|---|---|
| Form 10-Q for the quarter ended March 31, 2015 | May 5, 2015 | Alutto and Ginnetti | "1Q2015 10-Q" |
| Form 8-K for the quarter ended June 30, 2015 | July 23, 2015 | Ginnetti | "2Q2015 8-K" |
| Form 10-Q for the quarter ended June 30, 2015 | August 5, 2015 | Alutto and Ginnetti | "2Q2015 10-Q" |

37. In addition to the affirmative disclosure obligations required by the SEC, federal law prohibits a person from making a materially false or misleading statement in connection with the purchase or sale of a security. Moreover, when a company makes an incomplete statement that omits material information necessary to render the affirmative statement not misleading, that statement can be considered a violation of the federal securities laws even if the company did not have an independent duty to disclose the omitted information in the absence of the affirmative statement. These principles apply not only to Stericycle's filings with the SEC, but also to its other public statements made to investors, including on earnings calls and in investor presentations.

38. Public companies like Stericycle are required to maintain effective disclosure controls and procedures to ensure compliance with their SEC reporting obligations. Members of the company's executive team must be involved in creating and designing these controls, and must personally guarantee their effectiveness.

39. The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* defines an internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance." With respect to the reporting and compliance aspects of this definition, the

*Integrated Framework* specifically states that "[w]hen internal control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations." *See* The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* § 3 ("Requirements for Effective Internal Control").

40. Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires public companies to publish information in their annual and quarterly reports concerning the scope and adequacy of their internal control structure and procedures for financial reporting, and also to assess the effectiveness of such internal controls and procedures.

41. Section 302 of SOX requires a public company's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the company's internal controls. Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO and CFO are required to certify in each periodic report that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

- based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

- he or she and the other certifying officers:

- o are responsible for establishing and maintaining "disclosure controls and procedures" [i.e., controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;

- o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

- o have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and

- o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

  - o all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

  - o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release

46427, § II.A (Sept. 9, 2002) (footnotes omitted).

42. Defendants Alutto and Ginnetti provided these disclosure control certifications with Stericycle's 2014 10-K, 1Q2015 10-Q, and 2Q2015 10-Q.

**III.** **Defendants Mislead the Market about the Basis for, and the Sustainability of, Stericycle's Growth, Stericycle's Compliance with its Customer Contracts, and Stericycle's Ability to Retain Customers**

43. During the relevant period, Defendants consistently and repeatedly told investors that Stericycle was able to achieve strong and sustainable "organic" growth in its SQ business that drove the Company's financial success.

44. Between 2011 and 2015, Stericycle and its SQ business experienced impressive growth. The Company's revenue increased by 178% from 2011 to 2015, from $1.68 billion to $2.99 billion:



45. Stericycle's earnings per diluted share similarly increased from $2.85 in 2011 to $4.40 in 2015:



-13-

46.     In the first quarter of 2015, Stericycle's revenue increased by 16.4% from the first quarter of 2014, from $570 million to $663.3 million.  Stericycle's gross profit similarly increased from $255.5 million to $281.3 million.   In the second quarter of 2015, Stericycle's revenue increased by 14.6% from the second quarter of 2014, from $640.8 million to $715.7 million. Stericycle's gross profit also increased from $275.3 million to $304.8 million.  Overall, for the first six months of 2015, Stericycle's revenue and gross profit increased to $1.38 billion and $586.2 million, respectively, compared to the first six months of 2014.

47.     Stericycle's growth was driven in large part by the growth of its SQ business. Stericycle's SQ revenue increased by $71.9 million, or approximately 8%, in 2014, by $17.2 million, or approximately 7.6%, in the first quarter of 2015, and by $18.4 million, or approximately 8%, in the second quarter of 2015.

48.     This revenue growth had a beneficial impact on the price of Stericycle common stock.  Between the beginning of 2011 and mid-2015, Stericycle's stock price almost doubled from around $80 per share to over $130 per share.

49.     Defendants attributed the growth of its SQ business to "organic" revenue growth generated by a purportedly loyal customer base.

50.     For example, in the 2014 10-K, Stericycle represented that its "organic revenue growth" was "driven by higher revenues from Steri-Safe revenues and regulated waste services for retailers."  Stericycle made identical representations in the 1Q2015 10-Q and 2Q2015 10-Q.

51.     Stericycle told investors that it had "Strong Service Relationships with Customers," that its SQ customers were its most loyal, and that they "provide a stable and profitable customer base."

-14-

52.     Defendants represented that this purported customer loyalty resulted in sustained growth.  Stericycle told investors that "[a]lthough the contracted regulated waste services business is highly competitive, we have been able to maintain high customer retention through the quality of our customer service."   Taking into account both its SQ and LQ customers, Stericycle represented that its customer relationships had a weighted average remaining useful life of approximately 23 years during the relevant period.  In a similar vein, Stericycle repeatedly assured investors that it had always operated in accordance with the terms of its customer contracts.

53.     The reasons for Stericycle's tremendous growth and its ability to retain customers were highly material to Plaintiffs.  Because Stericycle's SQ business generates higher growth margins than its LQ business and accounts for almost two-thirds of the Company's revenue, the reasons for those higher growth margins and increased revenue were absolutely critical to Plaintiffs.   A company whose revenues, gross profits, and earnings per share are growing organically and sustainably – as Defendants represented – is a much different company than one that creates short-term revenue growth through unsustainable price increases and arbitrary fees.  Moreover, a company that is able to retain customers by earning the customers' trust and confidence is entirely different than one that is lying to and ultimately alienating its customer base.

54.     To organically and sustainably grow its SQ business, Stericycle needed to increase the range of products and services that it offered to its existing customers, expand its networks and service capabilities in the United States and internationally by way of complementary acquisitions, and improve its margins – just as it told investors it was doing.  Thus, to Plaintiffs – who were focused on the Company's long-term growth – it mattered whether Stericycle's SQ business was growing organically or by way of improper, unsustainable price increases and the imposition of arbitrary fees.

IV.    **Unbeknownst to Investors, Stericycle's Growth Was Driven by an Improper and Unsustainable Practice of Imposing Automatic Price Increases and on Charging Arbitrary Fees to its SQ Customers**

55.    Contrary to Defendants' representations, Stericycle's SQ business was not growing organically, Stericycle did not have strong, long-term relationships with its SQ customers, and the Company was not operating in accordance with its customer contracts.  Rather, Stericycle was growing its SQ business by imposing improper and unsustainable 18% price increases every six months and arbitrary fees on its SQ customers in direct violation of their contracts.  Once Stericycle's SQ customers realized that the Company was automatically increasing the price of their contracts and passing on fees that bore no relation to Stericycle's actual costs, they began leaving in droves, causing Stericycle's revenues to fall.

56.    When Stericycle solicited a new SQ customer, it offered that customer its "Steri-Safe" service.  Steri-Safe was a fixed-fee based service whereby the customer paid a monthly subscription fee and received ongoing healthcare waste pickup from Stericycle.  As reported in the Company's SEC filings, "Customers for our *Steri-Safe*® service pay a predetermined subscription fee in advance for regulated waste collection and processing services, and can also choose from available packages of training and education services and products designed to help them implement a specific business compliance program."  If a customer did not want the subscription service, Stericycle could offer a transaction-based plan, although the vast majority of Stericycle's SQ customers signed up for Steri-Safe.

57.    When an SQ customer agreed to participate in Steri-Safe, it was asked to sign Stericycle's standard form Service Agreement.

58.    The standard form Service Agreement set forth the fixed monthly fee the customer was to pay.  The standard form Service Agreement also laid out the narrow circumstances under

which Stericycle could increase the fixed fee, which were expressly limited to specific events largely beyond Stericycle's control that caused Stericycle's operating costs to rise.

59.     Specifically, Section 2(b) of the standard Terms and Conditions in the standard form Service Agreement provided:

> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, or residue disposal or to otherwise address cost escalation.

60.     Stericycle highlighted this aspect of its standard form Service Agreement in its SEC filings, explaining that the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."

61.     The vast majority of Stericycle's SQ contracts contained automatic renewal provisions that renewed the contract for the same term length as the original contract unless the SQ customer provided 60 days' written notice of termination during the six-month period prior to the renewal date.

62.     After a new Steri-Safe contract was signed, Stericycle employees inputted the SQ customer's information into its internal computerized contract management and billing system known as "Tower."

63.     Unbeknownst to its SQ customers, and contrary to the terms of the Service Agreement, Stericycle had a systematic practice of increasing the Steri-Safe fixed fee by 18% every six months.  This was known as the "Automated Price Increase," or "API."

64.     The API was built into Tower.  Unless a Stericycle employee manually inputted information into Tower that caused the billing system not to implement an API, Tower applied the API to the customer by default.

65. The API was not based on any increased operational costs incurred by Stericycle. The price of fuel, insurance or regulatory compliance did not automatically increase by 18% every six months. The API thus violated Stericycle's SQ customer contracts.

66. Stericycle executives and employees have testified in the Consumer Class Action that the API was "standard" for all Steri-Safe customers and was not based on an increase in operational costs incurred by Stericycle. Stericycle's Vice President of Operations, James Buckman, testified that an "[a]utomated price increase is a system-generated price increase that's applied to the customer's pricing" and that "the standard [API] percentage for [Stericycle's SQ] customers was 18 percent."

67. A former Stericycle billing employee, Tara Bender, explained how the API worked:

> So it's a systemic increase, it's not entered into by the actual billing team. There is a behind-the-scenes program that will automatically push the pricing to the customers' accounts. We called it automated because it was an automatic process not manually entered into the system . . . by an actual clerk.

68. Ms. Bender further testified that the 18% API was a "standard," "blanket" increase to an SQ customer's contract price every six months.

69. The decision to implement the API came from the very top of the Company. Specifically, it was Stericycle's highest-ranking executives – including Defendants Alutto, Ginnetti, and Arnold – who issued the order to impose the APIs on the Company's SQ customers.

70. Stericycle's former Vice President, Michael Kravets, testified in the Consumer Class Action that Stericycle's "executive team" were the ones who determined whether an API would be imposed. Kravets identified Defendants Alutto, Ginnetti, and Arnold as members of the Stericycle executive team that made that decision. Kravets testified that he participated in the meetings during which these executives made the decisions concerning APIs, and that such meetings occurred once or twice a year.

71.     Mr. Kravets' testimony is corroborated by the testimony of other Stericycle employees.  Mr. Buckman testified that Defendant Arnold was specifically involved in the decision to increase the frequency of the APIs from every nine months to every six months.

72.     Ms. Bender similarly testified that the APIs were "executive management-driven on down . . . its not [Stericycle's] billing team that is making these rules, they're driven from upper-level management."  Ms. Bender also stated that Stericycle's executive team received monthly API reports to "examin[e] how the price increase was going" because APIs were a "priority" and "something very important to the executive team."

73.     Stericycle's former COO, Richard Kogler, confirmed Mr. Kravets' testimony that the APIs were the brainchild of senior management, testifying that the "manner and method" by which Stericycle imposed the APIs was a "collaborative process" that included himself and the CFO.

74.     In addition to the APIs, Stericycle imposed numerous fees and surcharges on its SQ customers that bore no relation to Stericycle's actual costs.

75.     For example, Defendant Arnold tasked Mr. Buckman with creating a five-year model that had the "ability to feather in additional environmental and reg fees in the future."  As an example, Arnold proposed arbitrarily increasing Stericycle's environmental and regulatory fees by 2.5% in each of January, February, and March 2012.  Arnold also asked Mr. Buckman to "build in the 18 percent [API] per month" into the five-year model.

76.     According to former Stericycle employees, the environmental fee charged to Stericycle's SQ customers was simply made up and bore no relation to an actual cost or fee incurred by Stericycle.  According to another former employee, the environmental fee was related

to absolutely nothing and was implemented simply to boost earnings. The fuel and energy charges were similarly bogus.

77. Like the APIs, Mr. Kravets specifically named Stericycle's "executive team" as the persons responsible for deciding whether and when to increase the fuel, energy, or environmental fees charged to SQ customers.

78. The improper APIs and arbitrary fee increases were the primary driver of Stericycle's revenue growth between 2011 and 2015. Mr. Buckman testified that the APIs and environmental fee increases were "significant components" of Stericycle's growth during that period.

79. The purpose of imposing the APIs and arbitrary fee increases was to raise the price of Stericycle's stock and generate performance-based bonuses. Large portions of Defendants' compensation was tied to Stericycle's stock performance. In 2015, in particular, the stock option awards and performance-based bonuses that Defendants received comprised the overwhelming majority of their annual compensation, as demonstrated by the following table:

| Defendant | Salary | Cash Performance Bonus | Value of Stock Options Awarded | 401(k) Contribution | Total 2015 Compensation |
|-----------|--------|------------------------|-------------------------------|---------------------|--------------------------|
| Alutto | $488,269 | $465,327 | $2,510,200 | $1,750 | $3,465,546 |
| Ginnetti | $346,923 | $234,871 | $1,026,900 | $1,750 | $1,610,444 |
| Arnold | $343,077 | $234,871 | $1,026,900 | $1,750 | $1,606,598 |

80. Thus, maintaining Stericycle's stock price and growing the Company's revenue was extremely important to Defendants.

81. To maintain Stericycle's stock price, Defendants had to meet the published company performance projections of the Wall Street investment analysts who followed Stericycle. If the Company failed to meet the consensus performance estimates of these analysts, the floor would fall out from underneath Stericycle's stock price.

82. Stericycle's employees testified that meeting analyst expectations was one of the reasons why Defendants imposed the APIs and arbitrary fee increases on the Company's SQ customers.

83. According to Mr. Kravets, the APIs were imposed to "meet [Stericycle's] overall business goals," including Wall Street expectations and overall company performance.

84. Mr. Buckman admitted that Stericycle imposed the APIs and even increased their frequency from every nine months to every six months "in order to achieve revenue goals . . . ." Mr. Buckman testified in the Consumer Class Action:

> Q: But when you are making decisions about specific initiatives, such as changing the frequency of automated price increases, you don't go back and look and say, hey, how much is – you know, how much is it costing us to dispose of medical waste, how much are we paying for labor or any other specific cost factors when you are making those revenue decisions, do you?
>
> A: Not specifically.
>
> * * * * *
>
> Q: So, when you are deciding whether to change the frequency of automated price increases, you don't need to go back and look at those cost figures; all you need to do is make sure you hit your revenue numbers in order to make sure you keep your margins, right?
>
> A: In my role, yes.

85. Stericycle's improper practice of imposing APIs and arbitrary fee increases was unsustainable. While SQ customers might not have initially noticed the price increases, eventually they would become aware because an 18% increase every six months is significant. For example, a monthly fee of $100 would grow to a monthly fee of $270 in just three years. SQ customers were not willing to tolerate such large rate increases by Stericycle without a valid basis for the increase.

86. Defendants were fully aware of not only the impropriety of the APIs and arbitrary fee increases, but also of their unsustainability. Indeed, Mr. Kravets testified that he told Stericycle's executive team on multiple occasions that he disagreed with the APIs and that they were causing the Company to lose customers. According to Mr. Kravets, the APIs were "causing a significant amount of administrative burden and cost . . . with the end result being a customer loss. It was hurting [Stericycle's] customer loyalty results . . . ."

87. Mr. Kravets' concerns were dismissed by several different members of Stericycle's executive team, including Defendant Arnold, who told him that the APIs were "not a subject really worth discussing in the future." In other words, Defendant Arnold and others told Mr. Kravets to stop challenging the practice because it was allowing Stericycle to meet analysts' expectations, even though it was unsustainable in the long run.

88. Once Stericycle's SQ customers realized that the Company was significantly increasing the price of its services without justification, they tried to cancel their contracts. According a former Stericycle employee, customers were trying to terminate their contracts because of the APIs and the fact that Stericycle was pressuring them to purchase additional services they did not need.

89. Rather than put a halt to the improper practice of imposing APIs and arbitrary fees, Stericycle focused its efforts on other methods of customer retention, including lying to its customers or offering a decrease in the API rate.

90. Stericycle provided training to its customer service representatives and equipped them with "talk tracks" and "talking points" to deal with customers who were displeased with the improper APIs and arbitrary fee increases.

91.     Stericycle's executives directed employees in its customer complaint department to provide false justifications to customers who questioned the APIs and other fees.  That is, although there was no cost-increase basis for the APIs and arbitrary fees, Stericycle representatives falsely told SQ customers – at the direction of the executive team – that the increases were due to rising costs.

92.     Difficult SQ customers who refused to accept Stericycle's pretextual justification for the improper APIs and arbitrary fee increases were referred to the Company's customer retention department.

93.     The customer retention department would then try to bargain with the dissatisfied customers, sometimes offering a discount of the 18% API.  Thus, even though Stericycle was not entitled to impose APIs, it used the 18% API to negotiate a lower API, but an API nonetheless.

94.     Stericycle's retention efforts provided only temporary relief.  As more and more customers rejected the APIs and arbitrary fee increases, Stericycle's revenue growth began to suffer.

**V.      Defendants' Lies Begin to Unravel**

95.     The market began to learn of the impact of Defendants' fraud concerning the source of Stericycle's growth, the state of Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures through a series of negative earnings announcements.    However, each of these disclosures was only partially corrective of Defendants' fraud, and constituted only a partial materialization of the previously concealed risks.  The leakage by Defendants of the truth was gradual, and occurred over an extended period of time.  In fact, as they made these disclosures, Defendants continued to try and obscure the truth from investors by incorrectly attributing the negative information to factors other than the impermissible APIs and arbitrary fee increases.

96.     On October 22, 2015, the Company filed a current report on Form 8-K with the SEC for the quarter and nine months ended September 30, 2015 (the "3Q2015 8-K").  In the press release accompanying the 3Q2015 8-K, Stericycle revealed that its earnings per diluted share had ***drastically decreased*** by 51.6% to $0.47 from $0.96 in the third quarter of 2014 and by 27.8% to $2.04 from $2.83 in the first nine months of 2014.

97.     At the same time, the Company lowered its 2015 internal growth rate guidance from a range of 8% to 10% for its SQ customers to a range of 7% to 9%, and from a range of 5% to 8% for its LQ customers to a range of 4% to 7%.  Stericycle also lowered its 2015 earnings per share estimates to a range of $4.38 to $4.41 from a range of $4.46 to $4.69.

98.     Stericycle's stock dropped ***more than 19%*** on this news, from a closing price of $149.04 per share on October 22, 2015, to a closing price of $120.31 per share on October 23, 2015.

99.     This earnings announcement was a partial disclosure and materialization of the foreseeable risk that Defendants had previously concealed from the investing public.  Stericycle's improper practice of imposing 18% APIs every six months and arbitrarily increasing the ancillary fees charged to its SQ customers was the catalyst for the strong revenue growth that Stericycle had reported to the market prior to October 22, 2015.  When Stericycle revealed a slowdown in its growth and lowered its guidance, it partially revealed to the market that Defendants' prior representations were false or materially misleading.

100.    Plaintiffs suffered significant losses in connection with the October 22, 2015 partial disclosure and as a result of Defendants' materially false and misleading statements and omissions of material fact.

-24-

101.    Plaintiffs liquidated their position in Stericycle common stock following the October 22, 2015 partial disclosure.

102.    However, the October 22, 2015 partial disclosure did not reveal the whole truth about the Company's API fraud.  In 2016, the Company made several more partial disclosures that caused the price of its stock to plummet.  These disclosures included admissions by the Company that its growth was being stunted by "pricing pressure."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

**I.**    **Misrepresentations and Omissions about the Source of Stericycle's Growth**

**A.**    **2014 8-K**

103.    On February 5, 2015, Stericycle filed the 2014 8-K.  In the press release accompanying the 2014 8-K, Stericycle announced that its fourth quarter 2014 and annual 2014 revenues and gross profits were substantially up year-over-year from the corresponding periods in 2013.

104.    On the earnings call later that day, Defendant Ginnetti explained that Stericycle's "[d]omestic internal growth . . . was up 7.3%, consisting of SQ, up 8%; and LQ, up 7%." Defendant Arnold went on to highlight some of Stericycle's accomplishments in 2014, including that the Company "increased our regulated waste operational infrastructure, enabling the continued growth of our retail and SQ regulated waste business."

105.    This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading.  It was materially misleading for Defendant Ginnetti to highlight Stericycle's 8% SQ growth without informing investors that it was due to Stericycle's imposition of impermissible APIs and arbitrary fees on its SQ customers.  It also was materially misleading for Defendant Arnold to attribute the growth of Stericycle's SQ business to an increase in the Company's regulated waste operational infrastructure when it was due to the

Company's imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendants Ginnetti and Arnold knew that the APIs and fees were imposed on Stericycle's SQ customers so that the Company could drive up revenue, their statements about the nature of and reasons for the growth of Stericycle's SQ business were materially misleading.

**B.** **2014 10-K**

106. On March 3, 2015, Stericycle filed the 2014 10-K. In the 2014 10-K, Stericycle announced that its 2014 revenues, gross profits, and earnings per diluted share were much higher than in 2013.

107. Stericycle explained that its "*[o]rganic revenue growth* for domestic [SQ] customers increased by $71.9 million, or approximately 8%, driven by higher revenues from Steri-Safe revenues and regulated waste services for retailers." Stericycle identified its SQ customers as a "growth area" because "when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide. *We consider this factor to be the basis for the higher gross margins that we have achieved with our small-quantity customers relative to our large-quantity customers.*"

108. These statements, which caused Stericycle common stock to trade at artificially inflated prices, were materially false and misleading. It was misleading for Defendants Alutto and

Ginnetti to highlight Stericycle's 8% SQ growth, characterize it as "organic" and attribute it to higher revenues from the Company's Steri-Safe and regulated waste service programs and its SQ customers' ability to understand the potential risks of failing to comply with applicable regulations when it was due to Stericycle's imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendants Alutto and Ginnetti knew that the APIs and fees were imposed on Stericycle's SQ customers so that the Company could drive up revenue, their statements about the nature of and reasons for the growth of Stericycle's SQ business were materially misleading.

### C.   1Q2015 8-K

109.   On April 23, 2015, Stericycle filed the 1Q2015 8-K. In the press release accompanying the 1Q2015 8-K, Stericycle announced that its first quarter 2015 revenues and gross profits were substantially up year-over-year from the first quarter of 2014. On the earnings call later that day, Defendant Alutto explained that Stericycle's domestic internal growth was up 6.4%, with its SQ business up 8% and its LQ business up 5%. Alutto characterized the 8% increase of Stericycle's SQ business as "*organic internal growth*" and attributed it to the increased revenues from the Steri-Safe, communications solutions, hazardous waste disposal, and environmental solutions programs offered to SQ customers.

110.   This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading. It was misleading for Defendant Alutto to

highlight Stericycle's 8% SQ growth, characterize it as "organic," and attribute it to increased revenues from the Company's Steri-Safe, communications solutions, hazardous waste disposal, and environmental solutions programs when it was due to Stericycle's imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendant Alutto knew that the APIs and fees were imposed on Stericycle's SQ customers so that the Company could drive up revenue, his statement about the nature of and reasons for the growth of Stericycle's SQ business was materially misleading.

**D.    1Q2015 10-Q**

111.    On May 5, 2015, Stericycle filed the 1Q2015 10-Q. In the 1Q2015 10-Q, Stericycle reiterated that, for the first quarter of 2015, "*[o]rganic revenue growth* for domestic [SQ] customers increased by $17.2 million, or approximately 7.6%, driven by higher revenues from our Steri-Safe and regulated waste services for retailers."

112.    This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading. It was misleading for Defendants Alutto and Ginnetti to highlight Stericycle's 7.6% SQ growth, characterize it as "organic," and attribute it to higher revenues from the Company's Steri-Safe and regulated waste service programs when it was due to Stericycle's imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no

relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs;
(c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive
team; and (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs
and that they were causing the Company to lose customers. Because Defendants Alutto and
Ginnetti knew that the APIs and fees were imposed on Stericycle's SQ customers so that the
Company could drive up revenue, their statement about the nature of and reasons for the growth
of Stericycle's SQ business was materially misleading.

### E. The Shred-it Investor Call and Investor Presentation

113. On July 15, 2015, Stericycle announced that it was acquiring Shred-it International
Inc., a document destruction company. On an investor call the next day (the "Shred-it Investor
Call"), Defendant Alutto emphasized that Shred-it was a "perfect strategic fit" for Stericycle
because "[b]oth businesses have a similar and exciting growth pattern, which includes *strong
organic growth*, acquisitions and international expansion." An investor presentation (the "Shred-
it Investor Presentation") likewise stated that "Shred-it offers a significant strategic benefit and is
a strong fit within Stericycle's portfolio" because it shares a "[s]imilar and exciting growth pattern
(e.g. *strong organic growth*, acquisitions and international expansion)."

114. These statements, which caused Stericycle common stock to trade at artificially
inflated prices, were materially false and misleading. It was misleading for Defendants to
characterize Stericycle's growth as "strong" and "organic" when it was due to Stericycle's
imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things:
(a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street
expectations; (b) the additional fees and surcharges that were imposed bore no relation to
Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs
and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (d)

-29-

Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendants knew that the APIs and fees were imposed on Stericycle's SQ customers so that the Company could drive up revenue, their statements about the nature of Stericycle's growth was materially misleading.

**F.    2Q2015 8-K**

115.    On July 23, 2015, Stericycle filed the 2Q2015 8-K. In the press release accompanying the 2Q2015 8-K, Stericycle announced that its second quarter 2015 revenues and gross profits were substantially up year-over-year from the second quarter of 2014.

116.    On the earnings call later that day, Defendant Ginnetti explained that Stericycle's domestic internal growth was up 6.6%, with its SQ business up 8% and its LQ business up 5%. As in the first quarter, Defendant Alutto characterized the 8% increase of Stericycle's SQ business as "*organic growth*."

117.    This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading. It was misleading for Defendants Alutto and Ginnetti to highlight Stericycle's 8% SQ growth and characterize it as "organic" when it was due to Stericycle's imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendants Alutto and Ginnetti knew that the APIs and fees were imposed on Stericycle's SQ customers so that the Company could

drive up revenue, their statements about the nature of Stericycle's SQ business were materially misleading.

### G. 2Q2015 10-Q

118. On August 5, 2015, Stericycle filed the 2Q2015 10-Q. In the 2Q2015 10-Q, Stericycle reiterated that, for the second quarter of 2015, "*[o]rganic revenue growth* for domestic [SQ] customers increased by $18.4 million, or approximately 8%, driven by higher revenues from our Steri-Safe and regulated waste services for retailers." For the six months ended June 30, 2015, Stericycle reported that its "*[o]rganic revenue growth* for domestic [SQ] customers increased by $35.5 million, or approximately 8%, driven by an increase in Steri-Safe revenues and regulated waste services for retailers."

119. These statements, which caused Stericycle common stock to trade at artificially inflated prices, were materially false and misleading. It was misleading for Defendants Alutto and Ginnetti to highlight Stericycle's 8% SQ growth, characterize it as "organic," and attribute it to higher revenues from the Company's Steri-Safe and regulated waste service programs when it was due to Stericycle's imposition of impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendants Alutto and Ginnetti knew that the APIs and fees were imposed on Stericycle's SQ customers so that the Company could drive up revenue, their statements about the nature of and reasons for the growth of Stericycle's SQ business was materially misleading.

II.     **Misrepresentations and Omissions about Stericycle's Contracts**

A.     **2014 10-K**

120.    In the 2014 10-K, Stericycle explained that its Steri-Safe customers "***pay a predetermined subscription fee*** in advance for regulated waste collection and processing services . . . ."

121.    This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts.  It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle's Steri-Safe customers pay a predetermined subscription fee when, in fact, the Company was routinely imposing impermissible APIs and arbitrary fees on its SQ customers that were well in excess of their contract prices.  Among other things:  (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the APIs were not imposed to account for operational changes based on changes in the law, to cover increases in the cost of fuel, insurance, or residue disposal or to otherwise address cost escalation; (c) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (d) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (e) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers.  Because Defendants Alutto and Ginnetti knew that the APIs and fees were imposed in violation of Stericycle's customer contracts, their statement describing those contracts was materially misleading and omitted to state material facts.

122.    The 2014 10-K also touted Stericycle's "Revenue and Cost Stability" as one of its competitive strengths.  Stericycle explained that it is "generally protected from the cost of

regulatory changes or increases in fuel, insurance or other operating costs because ***our regulated waste contracts typically allow us to adjust our prices to reflect these costs changes***."

123.     This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts.  It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle's regulated waste contracts allowed the Company to adjust its contract prices to reflect the cost of regulatory changes or increases in fuel, insurance, or other operating costs when the Company was routinely imposing arbitrary fees on its SQ customers.  Among other things:  (a) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (b) the fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (c) Defendant Arnold tasked Mr. Buckman with creating a five-year Company model that had the "ability to feather in additional . . . fees in the future," like a 2.5% increase to Stericycle's environmental and regulatory fees in each of January, February, and March 2012.  Because Defendant Alutto and Ginnetti knew that the fees the Company imposed bore no relation to Stericycle's actual costs, their statement that Stericycle's regulated waste contracts allowed the Company to adjust its contract prices to reflect the cost of regulatory changes or increases in fuel, insurance, or other operating costs was materially misleading and omitted to state material facts.

### B.     The Shred-it Investor Call

124.     On the Shred-it Investor call, Defendant Alutto represented that Shred-it was similar to Stericycle because "***[r]eoccurring revenue and multi-year contracts provide both businesses with a very predictable revenue and profit profile.***"

125.     This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts.  It was

misleading for Defendant Alutto to represent that reoccurring revenue and multi-year contracts provided Stericycle with a very predictable revenue and profit profile when the Company was imposing impermissible and unsustainable APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the APIs were not imposed to account for operational changes based on changes in the law, to cover increases in the cost of fuel, insurance, or residue disposal or to otherwise address cost escalation; (c) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (d) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (e) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendant Alutto knew that the Company was engaging in an unsustainable practice of charging its SQ customers APIs and arbitrary fees, his statement that Stericycle had a predictable revenue and profit profile was materially misleading and omitted to state material facts.

## III. Misrepresentations and Omissions about Stericycle's Customers

### A. 2014 10-K

126. In the 2014 10-K, Stericycle touted its "Strong Service Relationships with Customers" as one of its competitive strengths. Stericycle claimed that "[a]lthough the contracted regulated waste services business is highly competitive, we have been able to maintain high customer retention through the quality of our customer service."

127. This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts. It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle was able to maintain high customer retention through the quality of its customer service when the Company was

imposing impermissible and unsustainable APIs and arbitrary fees on its SQ customers that had the opposite effect, and was instructing its customer service representatives to lie to customers about the basis for those APIs and fees. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers; (e) Stericycle's customer service representatives were provided with scripts that required them to provide SQ customers with pretextual justifications for the price and fee increases; and (f) Stericycle's retention department improperly bargained with SQ customers to negotiate a lower API to which the customers had never contractually agreed. Because Defendants Alutto and Ginnetti knew that Stericycle was cheating and lying to its SQ customers, their statement that Stericycle was able to maintain high customer retention through the quality of its customer service was materially misleading and omitted to state material facts.

128.    Stericycle also represented that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.8 years."

129.    This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts. It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle's customers had a weighted average remaining useful life of 23.8 years when the Company was imposing impermissible and unsustainable APIs and arbitrary fees on its SQ customers that would drive

customers away from the Company. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers; (e) Stericycle's customer service representatives were provided with scripts that required them to provide SQ customers with pretextual justifications for the price and fee increases; and (f) Stericycle's retention department improperly bargained with SQ customers to negotiate a lower API to which the customers had never contractually agreed. Because Defendants Alutto and Ginnetti knew that Stericycle was cheating and lying to its SQ customers, their statement that Stericycle's customers had a weighted average remaining useful life of 23.8 years was materially misleading and omitted to state material facts.

**B.** **1Q2015 10-Q**

130. In the 1Q2015 10-Q, Stericycle represented that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.6 years."

131. This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts. It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle's customers had a weighted average remaining useful life of 23.6 years when the Company was imposing impermissible and unsustainable APIs and arbitrary fees on its SQ customers that would drive customers away from the Company. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and

surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers; (e) Stericycle's customer service representatives were provided with scripts that required them to provide SQ customers with pretextual justifications for the price and fee increases; and (f) Stericycle's retention department improperly bargained with SQ customers to negotiate a lower API to which the customers had never contractually agreed. Because Defendants Alutto and Ginnetti knew that Stericycle was cheating and lying to its SQ customers, their statement that Stericycle's customers had a weighted average remaining useful life of 23.6 years was materially misleading and omitted to state material facts.

      C.    **<u>The Shred-it Investor Call</u>**

132. On the Shred-it Investor Call, Defendant Alutto claimed that Stericycle's "***SQ customers provide a stable*** and profitable customer base." Later on in the call, Defendant Arnold called Stericycle's SQ customers its "large, ***loyal*** base of customers."

133. These statements, which caused Stericycle common stock to trade at artificially inflated prices, were materially false and misleading and omitted to state material facts. It was misleading for Defendants Alutto and Arnold to represent that Stericycle's SQ customers were loyal and provided a stable and profitable customer base when the Company was imposing impermissible and unsustainable APIs and arbitrary fees on its SQ customers that would drive customers away from the Company. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the

direction of, Stericycle's executive team; (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers; (e) Stericycle's customer service representatives were provided with scripts that required them to provide SQ customers with pretextual justifications for the price and fee increases; and (f) Stericycle's retention department improperly bargained with SQ customers to negotiate a lower API to which the customers had never contractually agreed.  Because Defendants Alutto and Arnold knew that Stericycle was cheating and lying to its SQ customers, their statements that those customers were loyal and provided a stable and profitable customer base were materially misleading and omitted to state material facts.

### D.  2Q2015 10-Q

134.    In the 2Q2015 10-Q, Stericycle represented that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.3 years."

135.    This statement, which caused Stericycle common stock to trade at artificially inflated prices, was materially false and misleading and omitted to state material facts.  It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle's customers had a weighted average remaining useful life of 23.3 years when the Company was imposing impermissible and unsustainable APIs and arbitrary fees on its SQ customers that would drive customers away from the Company.  Among other things:  (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (c) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; (d) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers; (e)

Stericycle's customer service representatives were provided with scripts that required them to provide SQ customers with pretextual justifications for the price and fee increases; and (f) Stericycle's retention department improperly bargained with SQ customers to negotiate a lower API to which the customers had never contractually agreed. Because Defendants Alutto and Ginnetti knew that Stericycle was cheating and lying to its SQ customers, their statement that Stericycle's customers had a weighted average remaining useful life of 23.3 years was materially misleading and omitted to state material facts.

## IV. Misrepresentations that Stericycle Operated in Accordance with the Terms of its Customer Contracts

136. In the 2014 10-K, 1Q2015 10-Q, and 2Q2015 10-Q, Stericycle represented that "[w]e believe that we have operated in accordance with the terms of our customer contracts . . . ."

137. These statements, which caused Stericycle common stock to trade at artificially inflated prices, were materially false and misleading. It was misleading for Defendants Alutto and Ginnetti to represent that Stericycle had operated in accordance with the terms of its customer contracts when the Company had been imposing impermissible APIs and arbitrary fees on its SQ customers. Among other things: (a) the APIs were blanket, systematic increases imposed every six months to meet Wall Street expectations; (b) the APIs were not imposed to account for operational changes based on changes in the law, to cover increases in the cost of fuel, insurance, or residue disposal or to otherwise address cost escalation; (c) the additional fees and surcharges that were imposed bore no relation to Stericycle's actual fuel or insurance costs, or any other regulatory or operating costs; (d) the APIs and fees were well-known to, and imposed at the direction of, Stericycle's executive team; and (e) Mr. Kravets informed Stericycle's executive team that he disagreed with the APIs and that they were causing the Company to lose customers. Because Defendants Alutto and Ginnetti knew that the APIs and fees were not imposed in

accordance with Stericycle's customer contracts, their statements that the Company had operated

in accordance with its customer contracts were materially misleading.

## V.     Misrepresentations about the Effectiveness of Stericycle's Disclosure Controls and Procedures

138.     Defendants repeatedly certified that they had established effective disclosure

controls and procedures for Stericycle.

139.     In the 2014 10-K, Stericycle stated:

> **Evaluation of disclosure controls and procedures.**
>
> Our management, with the participation of our President and Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the fiscal year covered by this Report. On the basis of this evaluation, our President and Chief Executive Officer and our Chief Financial Officer each concluded that our disclosure controls and procedures were effective.
>
> The term "disclosure controls and procedures" is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act is recorded, processed, summarized and reported, within the time periods specified in the [Securities and Exchange] Commission's rules and forms." Our disclosure controls and procedures are designed to ensure that material information relating to us and our consolidated subsidiaries is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding our required disclosures.

140.     Along with the 2014 10-K, both Alutto and Ginnetti provided a certification

concerning Stericycle's disclosure controls pursuant to Section 302 of SOX.  Alutto and Ginnetti

each stated:

> 1.  I have reviewed this annual report on Form 10-K of Stericycle, Inc.;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit

committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

141. Alutto and Ginnetti provided substantively identical certifications in the 1Q2015 10-Q and 2Q2015 10-Q.

142. In the 1Q2015 10-Q, Stericycle stated:

*Disclosure Controls and Procedures*

Our management, with the participation of our President and Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the fiscal quarter covered by this Report. On the basis of this evaluation, our President and Chief Executive Officer and our Chief Financial Officer each concluded that our disclosure controls and procedures were effective.

The term "disclosure controls and procedures" is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as "controls and other procedures designed to ensure that information required to be disclosed by the issuer in the reports, files or submits under the Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms." Our disclosure controls and procedures are designed to ensure that material information relating to us and our consolidated subsidiaries is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding our required disclosures.

143. Stericycle made an identical disclosure in the 2Q2015 10-Q.

144. These statements, which caused Stericycle common stock to trade at artificially inflated prices, were materially false and misleading because Stericycle did not have effective

disclosure controls and procedures in place during the relevant time period. Although the impermissible APIs and arbitrary fees were well-known to, and imposed at the direction of, Stericycle's executive team, the Company did not have sufficient disclosure controls and procedures to ensure that such material information was reported to investors. Indeed, after Stericycle's former Vice President repeatedly voiced his opposition to the APIs, members of the Company's executive team told him that APIs were "not a subject really worth discussing in the future." At best, Defendants were indifferent to ensuring that Stericycle had adequate disclosure controls and procedures in place. At worst, Defendants were actively disregarding Stericycle's (clearly insufficient) disclosure controls and procedures so that they could continue to use the APIs and fees as a means to boost Stericycle's revenue and meet Wall Street expectations.

## ADDITIONAL ALLEGATIONS OF SCIENTER

145.  Plaintiffs repeat and re-allege each and every paragraph contained above as if set forth herein.

146.  Defendants Alutto, Ginnetti, and Arnold acted with scienter with respect to the materially false and misleading statements and omissions of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made. As senior executives of Stericycle during the relevant time period, Alutto's, Ginnetti's, and Arnold's scienter is imputable to Stericycle.

147.  Defendants Alutto, Ginnetti, and Arnold were well aware that Stericycle was imposing impermissible APIs and arbitrary fees on its SQ customers. In fact, Defendants Alutto, Ginnetti, and Arnold were members of the executive team at whose direction the impermissible APIs were imposed. Mr. Kravets testified that he participated in the meetings during which these executives made the decisions concerning the imposition of the APIs and fees, and that such meetings occurred once or twice a year.

148.  Mr. Buckman testified that Defendant Arnold was specifically involved in the decision to increase the frequency of the APIs from every nine months to every six months.

149.  Ms. Bender similarly testified that APIs were "executive management-driven on down . . . its not [Stericycle's] billing team that is making these rules, they're driven from upper-level management."  Ms. Bender also stated that Stericycle's executive team received monthly API reports to "examin[e] how the price increase was going" because APIs were a "priority" and "something very important to the executive team."

150.  Stericycle's former COO Richard Kogler confirmed that the APIs were the brainchild of senior management, testifying that the "manner and method" by which Stericycle imposed the APIs was a "collaborative process" that included himself and the CFO.

151.  Stericycle's arbitrary imposition of purported "environmental" and "regulatory" fees also were well-known to, and imposed at the direction of, Stericycle's executive team, including Defendants Alutto, Ginnetti, and Arnold.  Mr. Kravets specifically named Stericycle's "executive team" as the persons responsible for deciding whether and when to increase the fuel, energy, or environmental fees charged to SQ customers.

152.  In addition, Defendant Arnold tasked Mr. Buckman with creating a five-year model that had the "ability to feather in additional environmental and reg fees in the future."  As an example, Arnold proposed arbitrarily increasing Stericycle's environmental and regulatory fees by 2.5% in each of January, February, and March 2012.

153.  Defendants were warned by Mr. Kravets that the APIs were improper and harmful to the Company.  Rather than heed Mr. Kravets' advice, Defendants directed him not to interfere in their illicit scheme.

154.     Stericycle management trained the Company's customer service personnel to lie to SQ customers about the basis for the fee increases.  These employees were directed to tell unhappy SQ customers that the fee increases were necessary to offset increasing operating costs.  However, there was no support whatsoever for such an assertion.  Thus, Stericycle management directed employees in its customer complaint department to provide false justifications to customers who questioned the APIs and fees.

155.     The improper APIs and arbitrary fee increases were part of Stericycle's core operations.  The SQ business was the most important part of Stericycle's business because it resulted in higher gross margins than the LQ business.   The improper APIs and arbitrary fee increases were the primary driver of Stericycle's revenue growth between 2011 and 2015.  Rather than organically growing its SQ business by increasing the range of products and services offered to its existing customers, expanding its networks and service capabilities in the United States and internationally by way of complementary acquisitions, and improving its margins – as Stericycle told investors it was doing – Defendants Alutto, Ginnetti, and Arnold implemented a fraudulent scheme of imposing unsustainable and improper APIs and fees on the Company's SQ customers.  Defendants Alutto, Ginnetti, and Arnold were thus well aware that the organic growth of Stericycle's SQ business was not the primary driver of the Company's growth.

156.     Defendants Alutto, Ginnetti, and Arnold also acted with scienter with respect to the materially false and misleading statements and omissions of material fact set forth above because they had the motive and opportunity to commit fraud.  As numerous Stericycle employees testified, Defendants imposed the improper APIs and arbitrary fee increases to temporarily inflate Stericycle's revenue so that the Company could meet Wall Street analysts' consensus estimates.  This, in turn, propped up Stericycle's stock price.

157.    Defendants had personal financial interests in keeping Stericycle's stock price high because large portions of their compensation were tied to Stericycle's stock performance.  In 2015, in particular, the stock option awards and performance-based bonuses that Defendants received comprised the overwhelming majority of their annual compensation.

158.    Defendants Alutto, Ginnetti, and Arnold sold off large amounts of stock in 2015. In doing so, they benefitted from the artificial inflation of Stericycle's stock price caused by their fraud.  These stock sales were suspicious in their timing, and were not made pursuant to a Rule 10b5-1 plan.

159.    Defendants made the following stock sales in 2015:

| Defendant | Transaction Date(s) | Shares Sold | Price(s) per Share | Total Value | Profits Per Sale |
|---|---|---|---|---|---|
| Alutto | 02/12/2015 | 9,000 | $132.02 | $1,188,180.00 | $709.830.00 |
| **Total** | | **9,000** | | **$1,188,180.00** | **$709.830.00** |

| Defendant | Transaction Date(s) | Shares Sold | Price(s) per Share | Total Value | Profits Per Sale |
|---|---|---|---|---|---|
| Ginnetti | 02/17/2015 | 5,000 | $132.86 | $664,300.00 | $471,475.00 |
| Ginnetti | 07/29/2015 | 5,000 | $139.81 | $699,050.00 | $433,300.00 |
| **Total** | | **10,000** | | **$1,363,350.00** | **$904,775.00** |

| Defendant | Transaction Date(s) | Shares Sold | Price(s) per Share | Total Value | Profits Per Sale |
|---|---|---|---|---|---|
| Arnold | 02/17/2015 | 4,000 | $132.91 | $531,622.80 | $344,320.00 |
| Arnold | 07/30/2015 | 5,000 | $139.30 | $696,522.50 | $462,350.00 |
| **Total** | | **9,000** | | **$1,228,145.30** | **$806,670.00** |

## PLAINTIFFS' ACTUAL RELIANCE

160.    Plaintiffs, through HealthCor, actually read (or heard), reviewed, and justifiably relied on Defendants' misrepresentations prior to purchasing Stericycle stock.

161.    HealthCor began purchasing Stericycle common stock for Plaintiffs in July 2015.

162.    Prior to purchasing Stericycle stock for Plaintiffs, an analyst at HealthCor actually read (or heard), reviewed, and justifiably relied on the 2014 8-K and earnings call announcing the

Company's results for 2014, 2014 10-K, 1Q2015 8-K and earnings call announcing the Company's results for the first quarter of 2015, 1Q2015 10-Q, Shred-it Investor Call and Investor Presentation, and the 2Q2015 8-K and earnings call announcing the Company's results for the second quarter of 2015, including (as applicable) statements concerning the source of Stericycle's growth, the state of Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures.

163. As Plaintiffs continued to purchase Stericycle stock throughout 2015, an analyst at HealthCor kept abreast of publicly-disclosed developments concerning Stericycle and, prior to purchasing stock, as applicable, actually read (or heard), reviewed, and justifiably relied on the 2Q2015 10-Q, including (as applicable) statements concerning the source of Stericycle's growth, the state of Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures.

164. Defendants' statements concerning the basis for Stericycle's increased revenues, profits, and earnings per share, the terms of Stericycle's customer contracts, the state of Stericycle's customer relationships, Stericycle's compliance with its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures were material to HealthCor's decision to purchase Stericycle common stock on behalf of Plaintiffs.

165. HealthCor actually and justifiably relied upon information contained in (and/or statements made during, as applicable) the 2014 8-K and earnings call announcing the Company's results for 2014, 2014 10-K, 1Q2015 8-K and earnings call announcing the Company's results for the first quarter of 2015, 1Q2015 10-Q, Shred-it Investor Call and Investor Presentation, 2Q2015 8-K and earnings call announcing the Company's results for the second quarter of 2015, and the 2Q2015 10-Q (to the extent each such document was on file with the SEC, or the referenced

statements had been made, as applicable, at the time) in making each purchase and acquisition set forth in Exhibits A and B on behalf of Plaintiffs.

166.    Had HealthCor known the truth, it would not have purchased Stericycle common stock on behalf of Plaintiffs or, if it had done so, would not have paid the prices it did.

## PRESUMPTION OF RELIANCE

167.    In addition to Plaintiffs' actual reliance, Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Stericycle common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Stericycle common stock; and (e) Plaintiffs purchased Stericycle common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

168.    The market for Stericycle common stock was open, well-developed, and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, Stericycle common stock traded at artificially inflated prices during the relevant period.  This artificial inflation did not begin to dissipate until the market began to realize the nature and extent of Stericycle's misrepresentations and omissions concerning the source of the Stericycle's growth, the state of Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures.

169.    At all relevant times, the market for Stericycle common stock was efficient for the following reasons, among others: (a) Stericycle filed periodic reports with the SEC; (b) Stericycle

common stock met the requirements for listing, and was listed and actively traded on the NASDAQ; (c) numerous investment analysts followed Stericycle; and (d) Stericycle regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

170.    Plaintiffs purchased Stericycle common stock in reliance on the market price of Stericycle common stock, which reflected all the information in the market, including the misstatements and omissions by Defendants.

171.    Plaintiffs are also entitled to a presumption of reliance under *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material facts for which there was a duty to disclose.

## **LOSS CAUSATION**

172.    As the truth about the source of Stericycle's growth, the state of Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures gradually and slowly leaked into the market, the price of Stericycle common stock dropped precipitously.

173.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Stericycle common stock, as set forth in Exhibits A and B, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.

174.    Once a partial disclosure was issued partially correcting the prior false and misleading statements and omissions with respect to the source of Stericycle's growth, the state of

Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures, as detailed above in paragraphs 96 through 98 – and as the risks previously concealed by Defendants' material misstatements and omissions partially materialized – the price of Stericycle common stock declined precipitously, and Plaintiffs were damaged.

175.    On October 22, 2015, Defendants filed the 3Q2015 8-K, which revealed that its earnings per diluted share drastically decreased by 51.6% to $0.47 from $0.96 in the third quarter of 2014 and by 27.8% to $2.04 from $2.83 in the first nine months of 2014.

176.    At the same time, the Company lowered its 2015 internal growth rate guidance from a range of 8% to 10% for its SQ customers to a range of 7% to 9%, and from a range of 5% to 8% for its LQ customers to a range of 4% to 7%.  Stericycle also lowered its 2015 earnings per share estimates to a range of $4.38 to $4.41 from a range of $4.46 to $4.69.

177.    This earnings announcement was a partial corrective disclosure and partial materialization of the foreseeable risk that Defendants had previously concealed from the investing public.  Stericycle's improper practice of imposing 18% APIs every six months and arbitrarily increasing the ancillary fees charged to its SQ customers was the catalyst for the strong revenue growth that Stericycle had reported to the market prior to October 22, 2015.  When Stericycle revealed a slowdown in its growth and lowered its guidance, it partially revealed to the market that Defendants' prior representations were false or materially misleading.

178.    Stericycle's stock dropped more than 19% on this news, from a closing price of $149.04 per share on October 22, 2015, to a closing price of $120.31 per share on October 23, 2015.

**NO SAFE HARBOR**

179.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Stericycle who knew that those statements were false when made.

**FIRST CAUSE OF ACTION**

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Against all Defendants**

180.     Plaintiffs repeat and re-allege each and every paragraph contained above as if fully set forth herein.

181.     This cause of action is brought against Defendants Stericycle, Alutto, Ginnetti, and Arnold for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

182.     Defendants Stericycle, Alutto, Ginnetti, and Arnold both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the

materially false and misleading statements and omissions of material fact alleged herein to: (a) deceive the investing public, including Plaintiffs, as alleged herein; (b) artificially inflate and maintain the market price of Stericycle common stock; and (c) cause Plaintiffs to purchase Stericycle common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants Stericycle, Alutto, Ginnetti, and Arnold took the actions set forth above.

183. Defendants Stericycle, Alutto, Ginnetti, and Arnold both directly and indirectly: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of Stericycle common stock in an effort to artificially inflate and maintain the market prices for Stericycle common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

184. By virtue of their high-level positions at the Company, Defendants Alutto, Ginnetti, and Arnold were authorized to make public statements, and made public statements, on Stericycle's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

185. In addition, Defendants Stericycle, Alutto, Ginnetti, and Arnold had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.

186.     Defendants Stericycle, Alutto, Ginnetti, and Arnold acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants Stericycle's, Alutto's, Ginnetti's, and Arnold's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Stericycle's operations, business, performance, and prospects from the investing public, including (a) misstating that Stericycle's increased revenues, profits, and earnings per share were due to the organic growth of SQ business when, in fact, such increased revenues, profits, and earnings per share were driven primarily by Stericycle's unsustainable practice of imposing improper APIs  and arbitrary fees on its SQ customers; (b) concealing that Stericycle was violating the terms of its customer contracts; (c) misrepresenting the state of Stericycle's customer relationships; (d) misstating that Stericycle had operated in accordance with its customer contracts; and (e) misrepresenting the effectiveness of Stericycle's disclosure controls and procedures.

187.     By concealing these material facts from investors, Defendants Stericycle, Alutto, Ginnetti, and Arnold supported the artificially inflated price of Stericycle common stock.

188.     The dissemination of the materially false and misleading information and the failure to disclose material facts, as set forth above, artificially inflated the market price of Stericycle's common stock.  In ignorance of the fact that the market price was artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, as well as on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was recklessly disregarded by Defendants and not disclosed in public statements by Defendants, Plaintiffs purchased Stericycle common stock at

artificially inflated prices. Once a corrective disclosure was issued, the price of Stericycle's common stock substantially declined.

189.  At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to Stericycle's business, operations, performance, and prospects, which was concealed by Defendants, Plaintiffs would not have purchased Stericycle common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

190.  By virtue of the foregoing, Defendants Stericycle, Alutto, Ginnetti, and Arnold violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191.  As a direct and proximate result of Defendants Stericycle's, Alutto's, Ginnetti's, and Arnold's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's common stock.

192.  Taking into account the tolling of the limitations period by the filing of the class action complaint against Defendants in *In re Stericycle, Inc. Securities Litigation*, No. 1:16-cv-07145 (N.D. Ill.), from which Plaintiffs have validly opted out, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Alutto, Ginnetti, and Arnold

193.  Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

194.    This cause of action is asserted against Defendants Alutto, Ginnetti, and Arnold and is based on Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

195.    Each of Defendants Alutto, Ginnetti, and Arnold was, at the time of the wrongs alleged herein, a controlling person of Stericycle within the meaning of Section 20(a) of the Exchange Act.

196.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in and/or awareness of, the Stericycle's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Alutto, Ginnetti, and Arnold had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of Stericycle.

197.    Defendants Alutto, Ginnetti, and Arnold were provided with or had unlimited access to copies of Stericycle's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Alutto, Ginnetti, and Arnold each had direct and supervisory involvement in the day-to-day operations of Stericycle, and are therefore presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

198.    Defendants Alutto, Ginnetti, and Arnold culpably participated in Stericycle's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

199.    By reason of the conduct alleged in the First Cause of Action, Stericycle is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and

Defendants Alutto, Ginnetti, and Arnold are liable pursuant to Section 20(a) based on their control of Stericycle.

200.    Defendants Alutto, Ginnetti, and Arnold are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages they suffered in connection with their purchases of Stericycle common stock.

201.    Taking into account the tolling of the limitations period by the filing of the class action complaint against Defendants in *In re Stericycle, Inc. Securities Litigation*, No. 1:16-cv-07145 (N.D. Ill.), from which Plaintiffs have validly opted out, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### THIRD CAUSE OF ACTION

**Common Law Fraud**
**Against All Defendants**

202.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

203.    Defendants Stericycle, Alutto, Ginnetti, and Arnold made, authorized, or caused the representations and/or omissions set forth above.

204.    Those representations and omissions were material.

205.    The material misrepresentations set forth above were knowingly made by Defendants Stericycle, Alutto, Ginnetti, and Arnold with the intent to deceive, and Defendants Stericycle's, Alutto's, Ginnetti's, and Arnold's misrepresentations omitted and concealed material statements of fact from Plaintiffs.

206.    Defendants Stericycle, Alutto, Ginnetti, and Arnold knew that their representations were false and/or misleading, and their omissions were material and rendered their representations misleading at the time they were made or omitted.

207.    Defendants Stericycle, Alutto, Ginnetti, and Arnold knew that investors like Plaintiffs would receive and rely on such misrepresentations, and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase Stericycle common stock at inflated prices.

208.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Plaintiffs would not have purchased Stericycle common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid, had they known the true facts regarding, *inter alia*, the source of Stericycle's growth, the state of Stericycle's customer relationships, Stericycle's adherence to the terms of its customer contracts, and the effectiveness of Stericycle's disclosure controls and procedures.

209.    As a direct and proximate result of such reliance and Defendants Stericycle's, Alutto's, Ginnetti's, and Arnold's fraudulent misconduct, Plaintiffs have suffered damages.

210.    Moreover, based on the intentional, malicious, willful, and wanton conduct alleged herein, which indicates that Defendants Stericycle, Alutto, Ginnetti, and Arnold acted with improper motive and/or vindictiveness, Plaintiffs seek punitive damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

a.      Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

b.      Awarding Plaintiffs punitive damages for Defendants' intentional, malicious, willful, and wanton conduct as detailed above;

c.      Awarding Plaintiffs their attorneys' fees and costs; and

d.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:  November 22, 2019

                                       Respectfully submitted,

                                    HEALTHCOR OFFSHORE MASTER FUND, L.P. and HEALTHCOR SANATATE OFFSHORE MASTER FUNDS, L.P.

                                    By:_____ */s/ Andrew D. Campbell*_____
                                          Andrew D. Campbell (ARDC 6269494)
                                        Novack and Macey LLP
                                        100 North Riverside Plaza
                                        Chicago, IL  60606
                                        Tel. 312-419-6900
                                        *acampbell@novackmacey.com*
                                        *Local Counsel for Plaintiffs*

                                      Of Counsel:

                                      Lawrence M. Rolnick (*pro hac vice* motion to be filed)
                                      Marc B. Kramer (*pro hac vice* motion to be filed)
                                      Michael J. Hampson (*pro hac vice* motion to be filed)
                                      LOWENSTEIN SANDLER LLP
                                      1251 Avenue of the Americas
                                      New York, NY  10020
                                      Tel. 212.262.6700
                                      *lrolnick@lowenstein.com*
                                      *mkramer@lowenstein.com*
                                      *mhampson@lowenstein.com*